First case this morning is 241245 Bear Mountain Realty v. United States. Mr. Rolnick, I want to get you ready. Good morning, Your Honors. Thank you. I believe that there are very important public policies at stake on this appeal. The first important public policy, of course, is that the government has an obligation to run competitive bidding processes and award contracts to the lowest... You know we don't adjudicate policy. Yes, but I think policy should inform the way in which bid protests are... We're informed by the precedent. Okay, well I think even the precedent supports the idea that bid protests serve an important function and they are a private mechanism for ensuring that bid procedures are followed properly and that bid awards are made properly. And I submit that the decision of the court below undercut both of those public policies, that is the public policy of government awards and the public policy that should promote bid protests. So what are you seeking as relief here? I mean all this happened several years ago. I don't know exactly if it's in the record what the current status is of these various facilities, the kind of three out there. What are you seeking as relief? Two things at least. One is a finding that in fact the bid was improperly canceled, which I believe would entitle my client to recover at least the costs of mounting the bid protest, which are not insignificant. Hundreds and hundreds of thousands of dollars go into these bid protests. And in fact, if my client was correct and the bid was canceled to prevent award to my client... So it's the cost of putting together the bid protest, you're not talking about the costs of litigating the cancellation. Both. And in addition, since this bid is likely to, at least if the government can be believed, the bid is going to be solicited again. And since we've already gone through this process three times, we would like to have some kind of prophylactic or injunctive relief instructing the government not to improperly exclude or take actions that have the effect of trying to prevent an unfair or an unlawful solicitation. And I think in this case, we have... Counsel, what's your best evidence in the record that there was some sort of pretext that was driving the cancellation? Well, there's abundant evidence, but I'll point to the best evidence. The best evidence is that as... Well, there's a history. Can you give us your JA page? So don't just describe it, but if you can point us to something in the record or a specific page of the appendix, that'd be most useful. Sure. So when the government, when the IRS was informed that Bear Mountainside had won the bid, there was an immediate response in which they said, and I'll get to Burgoodside in a second, but let me describe it first. The immediate response was, how could this have happened? We tried to prevent this from happening. Let's put together our best arguments and we'll go have a meeting with the GSA and we'll convince the GSA to give the award to Springfield and not Mountainside. And then we see in the record efforts by the IRS... The Court of Federal Claims identified Mr. Mount as the key player, not Mr. Hubba and Mr. Lopez, right? And they said, let's try to see if we can find some deficiency reports from Bear Mountainside. It turns out that there are no deficiency reports. Then there's a critical September 27 meeting where the IRS is saying they're going to go talk to the GSA and convince the GSA not to award the contract to Mountainside. And what happens after that September 27 meeting, I think, is critical. After this September 27 meeting, they don't come out and say, oh, our needs have changed. Instead, the GSA reaches out to Bear Mountainside and writes a very carefully drafted email that says, we've looked at your bid. Your bid is well below the bids of other participants. You have a lot of obligations under this lease. These obligations are going to be very expensive. And in light of your bid, we want you to understand you're still going to have to do all this work. And so please, revisit or reconsider whether or not your bid is sufficiently high to allow you to satisfy all your obligations. It's not quite a reasonable request. I mean, if someone comes in with a bid and there's a record of, you're right, IRS employees complaining about the facility and the upkeep, that someone would come back to you and say, check out the numbers because you're going to need to make sure you're upkeeping the property. All of this seems pretty normal and natural to me. I guess the question is, would you expect them to come and say, hey, we don't want to award the bid to you, so we're going to try to see if we can make your bid increase. And you have to look at it in light of what the IRS is trying to get them to not award to Mountainside. So yeah, I think it's very unusual to come to a bidder and say, maybe you should consider increasing your bid. But let's draw the inferences, right? Because we're not even being given an evidentiary record here. We're not being allowed to have any depositions. We're not being allowed to question anybody. We're only getting this information from a Freedom of Information Act request. Do you also get interrogatories? Is my recollection correct in that regard? The interrogatories, frankly, are useless. Answer my question. Did you get interrogatories? Yes, we got interrogatory responses that were self-serving, conclusory, and useless. But let me just try to focus the Court on the key timeline here. I mean, you didn't even answer my question. I asked you for where in the record is the best support from a pretext argument. And you keep telling me you're going to get to it, but I'd like you to get to it now. I was going to describe it, then I'm going to give you the record set. I don't have it at my fingertips. It's in my outline, but I will give it to you. The critical point is, on October 3rd, they come to us and say, will you consider increasing your bid? I mean, on September 30th. On October 3rd, we say no. And then, to me, the key email is the one that Terry Mount then sends that says, and I'll give you the record set in just a second, but the email says, in light of lesser issues at Mountainside, and reluctance on the part of GSA to engage, we're changing our strategy. And what that document is telling you is they have their meeting on the 27th. Nobody ever said anything about any changed circumstances. They come to us and say, in fact, the circumstances haven't changed. Show us that you can perform these requirements. We then say no, and the very next piece of evidence is a statement from Terry Mount, we've changed our minds, we're not doing this solicitation. And then, in an internal email, he says, the reason for changing the strategy is because they don't like the lesser Mountainside, and the GSA's not playing ball with them. And I'll give you the record set for that email, which we got only through FOIA, again, and not through Discover. But all of your analysis about what happened and what information you've gleaned in the emails kind of ignores the backdrop, which I think is not disputed. Firstly, you've got two facilities really close to each other, and there's some questions raised about what the most efficient thing is to do between these two facilities. You've got a third facility that seems desirable that they got their eye on. You've got this elephant in the room called COVID, where I think every person in this room probably have the experience, as we did in even this court, of trying to discern bringing people back after an absence of a year or two, calculating who's going to be working remotely and who's not, and trying to bring all these people back. And then you've got the Infration Reduction Act, which passes at about the same time, which I think gives IRS another $80 billion to extraordinarily increase the number of workers they have, their workforce. So, people at IRS have a lot going on in this context, which is very much related to determining where these people ought to be and what leases they ought to be engaging in. So, you may have emails that don't talk about that, but that doesn't erase the fact that that was going on, and I think every manager in the country was confronting those issues at that time. Am I wrong? Yes, I think you are wrong for two reasons. First, that site is Appendix No. 80. I think you're wrong for two reasons. First of all, all that was known before the solicitation was launched. Second, if that actually happened, what you're suggesting and what they're saying in their self-serving affidavits, you would expect at least one document, one meeting, that somebody could say, yeah, after we went to you and tried to increase your bid, in that two-week period that ensued between that date and when we cancelled the solicitation, there would be one meeting, one document, anything that suggested that this was in fact the reason. It's not the reason because all of that was well-known before the solicitation even began. Well, it was well-known, but it's a transient situation and it takes a while to figure out how to deal with it. There were a lot of hiccups for every employer and every facility in the country in terms of doing this. It's not something is known and therefore we know what the solution is going to be and we're going to implement it. That didn't happen in one minute. That's something that happens over time. There's no evidence of it other than after the fact. There's no record evidence from the time the solicitation was made throughout all of the bidding in July and August, dozens and dozens and dozens of communications. No discussion of it when the award was made. No discussion of it when the IRS was informed the award was made. No discussion of it at the September 27th meeting with the GSA where they're attempting to tell the GSA, don't award it to Mountainside, award it to Springfield. There's no mention of it. If there was any mention of it, why would they come back to us and say, you're expected to perform according to these requirements and re-examine whether your bid is high enough. They would say, oh, change circumstances. Nobody ever said that. There's nothing in the record. It's just made up. Well, I don't know where it's in the record. There's something dated November 3rd, 2022 from Mr. Mount to Ms. Fitzpatrick and it indeed does talk about the consolidation of operations, business needs, the need for additional storage, the location of the IRS employees. That November 3rd email is a duplicate of an October 27th email in which he circulated internally to the IRS and said, just so you all know what's going on, we're changing our strategy because of lesser issues in Mountainside and the unwillingness of the GSA to engage with us. So he actually has a preceding email saying that the reason that they're doing it is to prevent award to Mountainside. Who is the email from? Terry Mellon. This is October. I've got a list of everything here. Anyway. All right. You're into your rebuttal time. Thank you, Your Honor. May it please the Court. The trial court correctly determined that Bear Mountainside failed to meet its heavy burden to demonstrate by clear and convincing evidence that the government canceled the request for lease proposals in bad faith. So in October 2022, the IRS requested the GSA cancel the solicitation based on, requested they cancel the solicitation. GSA came back and asked for more information and the IRS provided that information to Mr. Mountainside in that they planned on new hires, a need for additional storage space, and an intent to consolidate the IRS operations in the Mountainside and Springfield building to Island, New Jersey, which the IRS described as walking distance to Northeastern Corridor train rail and an ideal location for IRS employees and customer commuting. That's the November 30 email at appendix 3988. And as the Court noted, this was going on in the backdrop of the IRS's return to work, implementation of the return to work order in June of 2022 and the August 2022 enactment of the Inflation Reduction Act, which provided approximately $80 billion in additional funding to the IRS. What did you do with the emails on the record that demonstrate that at least a few different employees in the IRS were quite dissatisfied with the contract and didn't want it awarded? Well, the trial court thoroughly analyzed those emails. The trial court allowed supplementation administrative record with certain emails that Bear Mountainside had presented and thoroughly analyzed and looked at those emails and determined, yes, there was some evidence that some of the folks may have certainly disliked the Mountainside building and may have had some improper motives in wanting to not be there. But ultimately, Bear Mountainside failed to demonstrate by clear and convincing evidence the inferences from those emails didn't lead to the conclusion by clear and convincing evidence that the cancellation was pretextual. I mean, these are plainly— Is that the issue? I mean, I was a little confused by the terminology that's been thrown around in this case because you just used the word improper motives. I mean, if employees have complaints about where they're working, is that—is it an improper motive because it's not the reason that the IRS and the GSA gave? Is that what makes it improper because it was, as you said, it was hiding the ball? Is that what—because it's not itself—in and of itself, it's not improper for certain employees working in a facility to have complaints about that facility. That by itself isn't improper. So what makes it improper, the fact that they used a subterfuge for that and they made up all—allegedly made up all these other reasons other than the complaints of the IRS people? Right. Absolutely. I mean, there's nothing wrong with employees of an agency not liking the building they're in or complaining to their supervisors or even GSA about it. If the agency were to, you know, create a reason for—a reason for canceling that's simply not true to hide a desire simply, you know, to injure the plaintiff. I mean, specific intent to injure. That's a standard we have here. I mean, that could be improper motives. I don't think we have that evidence here even of even lower-level employees specifically wanting to injure Bear Mountainside here. As the trial court certainly found, there was evidence that they didn't want to be—certain employees didn't want to be in the Mountainside building. So is the problem with that, though, that that was not the rationale that was used by the agency when it terminated the cancellation? Now, that would be a problem, right? That's a subterfuge for employees. Employees didn't like it, but you didn't cancel it because employees didn't like it and it wasn't an adequate facility. You canceled it ostensibly for these other reasons, right? So that's what would make it improper. Right. If those weren't—if the reasons that were given, you know, a desire to move to this more desirable location in Island, New Jersey, the potential for new hires coming in, if those weren't the actual reasons for the cancellation, then yes, that could potentially be improper. But nevertheless, in that case, as the GAO found, in the case, there's still rational basis for the cancellation. Even if there were a pretext, you know, the agency still had a rational basis here that, you know— I mean, there's no dispute here that Island, New Jersey is on the Northeast Corridor. I don't think the plaintiff has disputed that, you know, it's an ideal— Yes, J.A. 80, that was the one that your opposing counsel specifically identified as his best evidence of pretext. Right, and the trial court addressed that email in its decision and thoroughly analyzed it. And in that email, Mr. Mount had said due to— Do you have the page number? Yeah, Appendix 80, yes. What's the page for the Court of Claims Opinion? Oh, that would be 15 to 16, I believe. What was that again? Appendix 15 through 16. That's where the court addresses this email. So Mr. Mount had said, due to lesser issues in Mountainside and GSA reluctance to engage with lesser threats of filing grievance actions against them, the strategy is changing for the Springfield-Mountainside locations. And the trial court correctly determined that, you know, contrary to plaintiff's implicit— this is at Appendix page 15—contrary to plaintiff's implicit suggestion, Mr. Mount's use of the word strategy is not inherently indicative of some malicious intent. And the trial court found that Mr. Mount's email was susceptible to multiple interpretations at Appendix page 16. So, you know, while perhaps it could lead to an inference of improper motives, the trial court also stated that Mr. Mount, having already determined that there was a need to reevaluate the IRS's space needs in the area, was explaining how the IRS's approach to the procurement would be changing to minimize the risk of litigation by seeking to leave the Mountainside and Springfield offices entirely. If there's various ways or various methods by which this evidence of cancellation can be examined, you know, different outcomes depending on how you interpret it, should that provide the basis for allowing discovery in order to get a robust record and decide that issue? And the trial court did allow discovery here. It allowed Bear Mountainside to recount certain interrogatories that it requested to the IRS. And so this was one of the unusual cases where the trial court did supplement the administrative record, both with documents provided by Bear Mountainside as well as interrogatories from the agency. And for all the reasons we stated in our brief that I can go into if there's particular questions, the trial court didn't abuse its discretion in denying the remaining requests that Bear Mountainside had made. Well, they wanted to depose a lot of people. Right. I mean, they wanted to depose the GSA contracting officer when there was no allegation of bad faith on the part of GSA and no demonstration that GSA even suspected that there was anything amiss in this request. So let me just take you to where we started, which was what your friend is seeking in terms of a remedy. So I don't know if it's in the record. I don't want to go outside of the record. What's going on now? Whatever happened? You had three facilities and you're bringing people back from COVID. Then you rely a lot on you got all this money from the Inflation Reduction Act to supplement it, which I think has been pretty much clawed back by Congress by now. So what's the current play with respect to these facilities? So the current status in terms of the actual operations, the folks are at the Springfield facility. A solicitation was issued in December 2024. Two solicitations actually were issued in December 2024, one for the Island area and another for the Kenilworth area, which is a little bit closer to the Springfield mountainside location, but they're not within that delineated area. And so those two procurements are ongoing. The agency's received offers. It's evaluating those offers and expects to issue requests for final proposal revisions in the near future. And the lease with the other lease is terminated now and the employees have moved out of the facility? Yeah, the mountainside lease expired after about 11 years of extensions. The mountainside lease expired in September 2023. And so those people moved to Springfield, I believe, and that lease is scheduled to expire in February 2016 at this time, though. That may require an extension. I'm sorry, February 2026 is what I meant. But, I mean, that may require an extension based on where the status of the procurement is. I expect it will. So the mountainside still has employees working there? No. Oh, I'm sorry. No, I'm sorry. That was Springfield. Oh, Springfield. Okay. Yeah, so Springfield is still ongoing. Current lease expires February 2026. Likely, you know, maybe a year extension to allow for the build-out of the new facilities and that sort of thing. But that's where we're at right now in terms of what relief the plaintiff's seeking. I don't know what it could get at this time. If there were a reversal, I suppose that would be for the trial court likely to figure out. But, you know, for all the reasons we stated, this trial court's judgment should not be reversed. It should be affirmed. Thank you. Thank you. Well, we still have two minutes. Your Honor, I apologize. I gave you the wrong site. It is appendix 80, not 90. I had it. Appendix 8-0, right? It's appendix number 8-0. Yes, okay. 8-0. I had said 9-0 because my notes. We heard 8-0. We heard 8-0, yes. Okay. That's when we talked to the opposing counsel. So briefly, who knows what will happen with Springfield? They're still there. They moved everybody to Springfield, which was always their plan anyway. And they shut down Mountainside, which was always their plan. Had there been any issues with respect to the adequacy of the building, that would have been addressed by GSA. There were no problems or deficiencies with the building. The reports that they produced indicate that. But it's legitimate for an agency to decide on location in terms of the convenience of employees and the access to certain types of. Of course. Of course. And they have an obligation to make sure that the facility is adequate. I just didn't want. We're not saying that people can't express their view that they don't like the building. But if the building meets the requirements and is the lowest bid, and the GSA has decided to award to the lowest bidder, it's improper to engage in a subterfuge to prevent award. And, you know, one of the important things I think that the court has to consider here is we weren't allowed to have any discovery. You know, we weren't allowed to ask Mr. Mount what he meant when he said, quote, due to lesser issues in Mountainside and GSA reluctance to engage. You said you weren't allowed any discovery. You were allowed discovery. You're saying you weren't allowed to put depositions. Well, we were allowed interrogatories that said, did you cancel the lease for an improper purpose? Answer, no. Tell us when this arrived, when this issue, you know, when did the changed circumstances arrive, come up? And these answers, they never said, oh, at this meeting or here's the document. They just said, well, generally in June of 2022, people were coming back from COVID. And, oh, generally there was an IR. They just made these general statements without identifying any meetings, any notes, any contemporaneous evidence. And, of course, what do you expect people to say in an interrogatory? Yes, we did, you know, we did single out Bear Mountainside and canceled their solicitation because we didn't want them to get it. They're never going to say that. I mean, in a deposition at least you would have been able to go to Fitzpatrick, the GSA officer, and say, tell me about the September 27th meeting. Why did you cancel this? Why did you demand reasons for the cancellation after they, you know, had given them to you? And, you know, the judge can, you all can read this email as well as the judge below. The idea that the word strategy doesn't have any implicitly negative association with it, the plain words of what he's saying is we're doing the strategy, we're changing it because of lesser issues in Mountainside and refusal of GSA to engage. He's saying it in black and white. So, you know, when you don't even have discovery, they didn't even give us this email. I had to go find this email through a FOIA request. How are bid protesters supposed to be able to show bad faith with no discovery and the standard is highly probable? Let me ask you this. If this bid, if GSA had said we're awarding this to Springfield, does anybody doubt that they would have gone forward with that bid award? We need to bring this to a close. So the standard isn't irrefutable evidence of admissions by wrongdoers, okay? The standard can't be that high. The standard is only highly probable. And when you look at the whole history here of trying to exclude Bear Mountainside, keep in mind, Springfield was never subjected to a competitive bid. It was always hand-selected. And throughout this effort of trying to get the general.  We need to bring this to an end. Okay. Okay. Thank you, Your Honor. I just think that my final word is just the combination of the lack of any evidentiary record and lack of discovery coupled with the extraordinarily high burden of essentially requiring admissions from people engaged in the misconduct sets a standard that's just impossible for anybody to meet. Thank you. We thank both sides. The case is extended.